IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| MARY ANN HECKMAN,                  Plaintiff <br><br> v. <br><br> ZURICH HOLDING COMPANY OF AMERICA, INC. and UNIVERSAL UNDERWRITERS INSURANCE COMPANY D/B/A UNIVERSAL UNDERWRITERS GROUP, <br><br>                 Defendants. | Case No. 06-2435 KHV |

## COMPLAINT

Plaintiff, Mary Ann Heckman, for her claims against Zurich Holding Company of America, Inc. and Universal Underwriters Insurance Company d/b/a Universal Underwriters Group, states and alleges as follows:

## THE PARTIES

1. Plaintiff, Mary Ann Heckman, is an individual residing at 429 Huntington Road, Kansas City, Missouri.

2. Defendant Zurich Holding Company of America, Inc. ("Zurich NA") is a Delaware Corporation. Zurich NA maintains its corporate headquarters in Schaumburg, Illinois.

3. Defendant Universal Underwriters Insurance Company d/b/a Universal Underwriters Group ("UUG") is a Kansas Corporation and conducts business at 7045 College Boulevard in Overland Park, Kansas. UUG provides commercial insurance coverage via Universal Underwriters Insurance Company to automotive dealerships and the automotive aftermarket industry.

**JURISDICTION AND VENUE**

4. Jurisdiction over this matter is proper pursuant to 28 U.S.C. §1332, as the claims are between citizens of different states and the amount in controversy exceeds $75,000.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

**ALLEGATIONS COMMON TO ALL COUNTS**

**I.     Plaintiff is hired by Zurich NA to serve as a research attorney for UUG**

6. On or about August 1995, Plaintiff was hired by Zurich NA as a Research Attorney.

7. Plaintiff was employed by Zurich NA for tax purposes but performed her work primarily for another employer, UUG, and served under and was required to report to UUG executives.

8. At the time Plaintiff was hired, UUG was charging insureds premiums inconsistent with various state regulations and in excess of UUG's filed rating plans submitted to various states. In short, UUG was significantly overcharging its customers.

9. At the time Plaintiff was hired, UUG's General Counsel was Curt Starnes. At this time, Mr. Starnes and others at UUG were in the beginning phase of developing a comprehensive compliance program to remediate UUG's existing rating and compliance problems.

10. Notably, Steve Rand, Zurich NA's *current* Commercial Markets Executive Vice President, was at this time, UUG's Vice President and General Manager of UUG's Eastern Division and District Manager for Pennsylvania. During his time with UUG, Mr. Rand was aware UUG was charging insureds premiums inconsistent with various state regulations and in excess of the rating plans UUG submitted to various states.

## II. Top-level executives and supervisors at Zurich Switzerland, Zurich NA and UUG are aware of UUG's compliance violations in 1995 and beyond

11. In 1995 and beyond, top-level executives and supervisors at Zurich Financial Services ("Zurich Switzerland"), Zurich NA and UUG (collectively "the Companies"), including, but not limited to, Gabe Shawn Vargas (the Chief Compliance Officer of Zurich Switzerland) and Dave Bowers (Zurich NA's Executive Vice President and highest ranking legal officer (hereinafter "Zurich NA's Top Legal Officer Bowers")), were aware of UUG's compliance violations and the proposed efforts by the legal department to remedy the violations. However, none of these executives and/or supervisors cooperated with UUG's legal department's attempts to remedy the violations.

12. Plaintiff's personal involvement in compliance issues began in 1998 when she was directed to assume partial responsibility for distributing certain compliance audits.

13. UUG's Property and Casualty Services Department conducted rating and pricing audits.

14. The information obtained was then provided to UUG's legal department and then distributed by Plaintiff to certain UUG officers and employees, including, but not limited to, the acting Presidents and CEOs, including Ken Goldstein and Steve Smith, Executive Vice President Mike McHugh, the senior risk management officer, the senior vice president and the Vice President/General Manager of the audited business division, including Steve Rand, Dennis Kane and Bob Tshippert.

15. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION. THE**

**UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

16. The Universal companies, which include UUG, had a Board of Directors ("Board of Directors"). The CEO of Zurich NA, Zurich NA's CFO and Zurich NA's Top Legal Officer Bowers were members of the Board of Directors.

17. Each year, the Board of Directors, as part of the annual board meetings, received a report that gave notice of UUG's compliance violations.

18. Thus, the Companies' top-level executives and supervisors were made aware, on an annual basis, of UUG's compliance violations, deficiencies and problems referenced in compliance audits.

**III. The Companies ignored UUG's violations documented in the yearly compliance reports and instead chose to collect the profits generated as a result of the violations**

19. The corrective action plans contained in the yearly compliance reports were repeatedly ignored by the Companies' executives, supervisors, and the various business units who were responsible for correcting the deficiencies. This is not surprising because UUG paid substantial monies each year to Zurich NA as a result of UUG meeting and/or exceeding profitability goals. These profitability goals were set by Zurich NA.

20. The Companies' executives knew that if they addressed the compliance violations and implemented the corrective action plans, they may fall short of the annual return on equity goals and Zurich NA would not receive its annual distribution of substantial monies obtained as a direct result of compliance violations.

21. The key individuals that set the pricing goals were also aware of the compliance problems for many years. These individuals include: Ken Goldstein (former CEO of UUG), Steve Smith (former CEO of UUG), Mike McHugh, Dennis Kane (Senior Vice President of the

Dealer Division), Bob Tschippert (Senior Vice President of the Special Accounts Unit) and each and every general manager and vice president of the regional sales divisions as well as countless other employees. During his tenure with UUG, Steve Rand also set pricing goals for his division.

22. Despite being aware of the compliance violations, these executives, supervisors and employees did nothing to heed, implement or otherwise pay attention to the corrective action plans promulgated by Plaintiff and other members of UUG's legal department.

23. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION. THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

### IV. The Kansas Department of Insurance conducts the Kansas Market Conduct Exam and UUG's violations are exposed

24. On or about December 2004, the Kansas Department of Insurance ("KDI") performed a Market Conduct Exam.

25. The KDI issued its draft report to UUG on or about June 29, 2005.

26. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION. THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

27. The KDI ordered UUG to refund to its customers overcharges discovered during the examination. The KDI published that it found a "large number of rating errors" in UUG's commercial package policies. Moreover, KDI estimated that the refunds would range from

$1,000 to $10,000 per commercial account and cover Kansas policies issued on or after January 1, 2002.

28.     Thereafter, Zurich Switzerland took a $100 million charge to cover its estimate of the cost of the refunds in all states.

29.     The results of the examination were not a surprise to the Companies as many top-level executives and supervisors knew about the compliance violations for at least the previous ten years.

30.     **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

**V.     Plaintiff is promoted to UUG's Interim General Counsel**

31.     On or about July 7, 2005, Plaintiff was promoted to UUG's Interim General Counsel as a result of UUG's acting General Counsel, Mr. Starnes, being placed on administrative leave.

32.     Upon accepting this promotion, Zurich NA's Top Legal Officer Bowers promised Plaintiff that he would recommend Plaintiff be named UUG's General Counsel if Mr. Starnes did not return to UUG.

**VI.    Zurich Switzerland and Zurich NA hire the law firm of LeBoeuf, Lamb, Greene and MacRae LLP to attempt to insulate itself from UUG's violations**

33.     **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

34. UUG did not hire a law firm to represent its interests in relation to the exposed compliance violations.

35. When LeBoeuf's investigation began, Plaintiff willingly participated in efforts to assist LeBoeuf and assisted in coordinating the logistics of the investigation.

36. Plaintiff was interviewed by LeBoeuf attorneys John Letteri and William Horn as well as two Zurich NA internal auditors. The interview focused on the now public compliance problems and Plaintiff's efforts to rectify them.

37. Plaintiff informed LeBoeuf that both Zurich Switzerland and Zurich NA were aware of UUG's compliance violations and had been for years.

38. In August 2005, a meeting was held in LeBoeuf's Washington D.C. office. The meeting participants included Plaintiff, the LeBoeuf attorneys representing Zurich Switzerland, Monica Maechler (Zurich's General Counsel and Company Secretary), Urs Schwartz (a Zurich in-house lawyer who reported directly to Ms. Maechler), Tom Bradley (the President and CEO of UUG), Zurich NA's Top Legal Officer Bowers, Mike McHugh, Randy Seiner (Zurich NA's Vice President of State Government Affairs), Benson Jeffress and others.

39. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION. THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL...**

40. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION. THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

41. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

42. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

43. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

**VII. LeBoeuf represents to a state insurance regulator that Zurich Switzerland and Zurich NA were unaware to UUG's compliance violations—these representations were false**

44. During a meeting in September 2005 with the Pennsylvania insurance regulator, LeBoeuf's attorneys represented to the regulator that UUG made the decision to overcharge customers without the knowledge of Zurich Switzerland and/or Zurich NA.

45. This representation was false and completely ignored Plaintiff's statements made to LeBoeuf's John Letteri and William Horn during the aforementioned interview that Zurich Switzerland and Zurich NA were aware of UUG's compliance violations.

46. This representation also ignored the fact that Steve Rand, Zurich's current Commercial Markets Executive Vice President, had direct knowledge of UUG's compliance

violations based on the fact he was actually a party to the violations when he was Vice President and General Manager of UUG's Eastern Division and District Manager for Pennsylvania.

47. After this meeting, it became clear to Plaintiff that (1) LeBoeuf's investigation was purposely ignoring the fact that Zurich Switzerland and Zurich NA were knowing and willing beneficiaries of UUG's compliance violations and (2) LeBoeuf, Zurich Switzerland and Zurich NA were going to continue to make misrepresentations to state regulators regarding Zurich Switzerland and Zurich NA's alleged lack of knowledge.

**VIII.   Plaintiff Blows the Whistle**

48. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

49. Plaintiff told President and CEO Bradley and Zurich NA's Top Legal Officer Bowers that she would neither cooperate with nor support the story LeBoeuf had apparently crafted to insulate Zurich Switzerland and Zurich NA.

50. Shortly after informing President and CEO Bradley and Zurich NA's Top Legal Officer Bowers that she would not support LeBoeuf's story, the Companies prohibited Plaintiff from engaging in any further direct communications, either written or oral, with any state regulator without first having the sum and substance of such communications filtered through LeBoeuf.

51. At this point, it became clear that Zurich NA's Top Legal Officer Bowers, President and CEO Bradley and LeBoeuf were not acting in the best interest of UUG, were not conducting a fair and impartial investigation, and were going to continue to lie to state insurance regulators.

### IX. Zurich NA's Top Legal Officer Bowers becomes concerned after Plaintiff blew the whistle and sends an in-house attorney on his staff to monitor Plaintiff

52. After Plaintiff blew the whistle and reported her concerns regarding the partiality of the LeBoeuf investigation, Zurich NA's Top Legal Officer Bowers decided to pay to send an in-house lawyer from his staff in Schaumburg, Illinois, Dick Hennig, to Overland Park, Kansas to monitor Plaintiff.

53. The stated reason for Mr. Hennig's presence in Overland Park was to "offer any assistance he could" on the compliance remediation efforts.

54. The timing of Mr. Hennig's deployment was curious to Plaintiff because much of regulatory communications had already taken place.

55. Plaintiff later learned that LeBoeuf recommended a Zurich NA representative be on-site to oversee the remediation efforts under the pretext that Zurich NA had "corporate governance obligations."

56. After Mr. Hennig's arrival in Kansas, Plaintiff learned the real reason Mr. Hennig was deployed was because LeBoeuf and Zurich NA's Top Legal Officer Bowers were concerned about Plaintiff exposing the LeBoeuf investigation as a sham and believed Mr. Hennig's presence would restrict Plaintiff from continuing to question the investigation.

### X. President and CEO Bradley reports "he has been fully briefed" on the LeBoeuf investigation and Plaintiff blows the whistle once again regarding the LeBoeuf investigation

57. On or about October 6, 2005, President and CEO Bradley called a meeting with various UUG employees, including Plaintiff. At this meeting President and CEO Bradley stated he and Axel Lehmann, Zurich NA's CEO, had been fully briefed on the LeBoeuf investigation and that the Companies would not terminate anybody as a result of the investigation.

58. Plaintiff was never shown a copy of any written report relating to the investigation although LeBoeuf drafted a report containing the findings of their investigation (hereinafter "LeBoeuf Report").

59. Later that day, Plaintiff met with President and CEO Bradley in his office. Plaintiff requested Zurich NA's Top Legal Officer Bowers participate by phone. He did not participate.

60. Zurich NA's Top Legal Officer Bowers refusal to participate was consistent with his habit of being "unavailable" during critical conferences and meetings surrounding the compliance violations and the LeBoeuf investigation.

61. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION. THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

62. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION. THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

63. President and CEO Bradley reassured Plaintiff that she would not be made a scapegoat and offered to prepare, along with Zurich NA's Top Legal Officer Bowers, a positive performance evaluation to entice Plaintiff to continue carrying out her duties as Interim General Counsel.

64. On or about October 24, 2005, Plaintiff, along with UUG's Randy Seiner and Benson Jeffress initiated a phone conference with President and CEO Bradley.

65. Again, Zurich NA's Top Legal Officer Bowers was invited to participate in this conference but chose not to participate.

66. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

67. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

### XI. Plaintiff is discharged in retaliation for blowing the whistle

68. On February 27, 2006, President and CEO Bradley fired Plaintiff.  Russ Alford, Vice President of Corporate Development for UUG was present during the firing.

69. President and CEO Bradley stated the reasons he was firing her were because of the content of the LeBoeuf Report which opined, *inter alia*, Plaintiff failed to report UUG's compliance violations and that Plaintiff had requested all UUG compliance audits be suspended.

70. President and CEO Bradley knew these reasons were false but nonetheless fired Plaintiff despite the fact he told her that he and Zurich NA's Top Legal Officer Bowers would provide Plaintiff a positive review to appease her concerns that she would be made a scapegoat by LeBoeuf and the Companies.

71. **REDACTED AT DEFENDANTS' REQUEST AS DEFENDANTS CLAIM THE CONTENT OF THIS PARAGRAPH CONTAINS PRIVILEGED INFORMATION.  THE**

**UNREDACTED VERSION OF THE COMPLAINT ORIGINALLY SENT TO DEFENDANTS IS ATTACHED AS EXHIBIT 1 AND IS FILED UNDER SEAL.**

### XII. President and CEO Bradley, by letter, mandates Plaintiff not disclose any of the Companies' conduct to anyone, including her own "personal counsel"

72. During the firing, President and CEO Bradley gave Plaintiff a letter demanding that she refrain from sharing "information learned or gleaned as a result of [her] position as in-house counsel for UUG" with anyone, including her own "personal counsel."

### XIII. UUG immediately cuts off Plaintiff's access to her company phone and computer and is told to leave the premises and is forced to leave personal items behind

73. During the firing, UUG prevented Plaintiff from using her company phone or accessing her computer.

74. A mere fifteen minutes after she was fired, Plaintiff was informed she had to exit the premises and was prohibited from gathering the entirety of her personal effects.

75. Plaintiff exited the premises and was forced to leave behind personal effects and other files.

76. Thereafter, UUG boxed up Plaintiff's items she was forced to leave behind and shipped them to her house.

### XIV. UUG sends out an email to some 1,900 employees informing them Plaintiff has been fired

77. After Plaintiff was fired, UUG sent an email to some 1,900 employees informing them Plaintiff had left UUG to pursue other interests.

78. The employees, including many of Plaintiff's friends and peers within UUG, knew this was untrue and that she had been fired.

79. Soon word spread and most, if not all, of the 1,900 employees, based on the email, knew Plaintiff had been fired.

## XV. Defendants' Counsel Threatens to Seek Sanctions Against Plaintiff and the Undersigned

80. On or about July 27, 2006, Plaintiff's counsel sent a draft complaint to counsel for Defendants. A copy of the draft complaint is attached as Exhibit 1 and is filed under seal.

81. The next day, Defendants' counsel sent a letter to Plaintiff's counsel threatening to seek sanctions against Plaintiff and Plaintiff's counsel if the complaint was filed. A copy of the letter is attached as Exhibit 2 and is filed under seal.

82. Plaintiff and Plaintiff's counsel disagree with the assertions contained in the letter and believe it is Defendants attempt to keep the egregious and unlawful behavior of the Defendants from being made public.

83. Out of an abundance of caution, Plaintiff has redacted each and every paragraph that Defendants' allege improperly reveal attorney client communications in this Complaint and has filed the original complaint under seal but incorporates the language of the original complaint into this Complaint.

## COUNT I
## Retaliatory Discharge for Whistle-Blowing

84. Plaintiff repeats and realleges the allegations of paragraphs 1-83 of the Complaint as if those allegations were set forth herein in their entirety.

85. Plaintiff was an employee of UUG and Zurich NA from 1995 until she was discharged on or about February 27, 2006.

86. During Plaintiff's employment, Zurich NA and UUG were engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare.

87. Such activities, include, but are not limited to, lying and misleading various state insurance regulators and others that Zurich Switzerland and Zurich NA had no knowledge of UUG's compliance violations that had been occurring as far back in time as 1995.

88. Plaintiff refused to participate in such activities and reported such activities that were in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare to company management of Zurich NA and to company management of UUG including UUG's highest ranking employee—President and Chief Executive Officer Tom Bradley.

89. UUG, as well as Zurich NA and Zurich Switzerland, had knowledge of Plaintiff's reporting of such activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare, prior to discharging Plaintiff.

90. Plaintiff's reporting was done out of a good faith concern over the wrongful activities.

91. Plaintiff was discharged in retaliation for making the reports.

## COUNT II
## Defamation

92. Plaintiff repeats and realleges the allegations of paragraphs 1-91 of the Complaint as if those allegations were set forth herein in their entirety.

93. Top-level/supervisory executives at Zurich NA and UUG as well as attorneys for LeBoeuf working on behalf of Zurich NA communicated false and defamatory words regarding Plaintiff to other top-level/supervisory executives at Zurich Switzerland, Zurich NA, UUG, to over 1900 Zurich NA and UUG employees, as well as to other third-parties.

94. The third-parties include various insurance regulators for various states and others in the insurance industry.

95. As a direct result of the aforementioned false and defamatory words Plaintiff's reputation was harmed.

WHEREFORE, Plaintiff Mary Ann Heckman respectfully requests that this Court enter judgment against the Defendants and award plaintiff (1) actual damages, including but not limited to back pay and front pay; (2) damages for mental anguish; (3) damages for loss of professional reputation; (4) punitive damages for the malicious/vindictive/wanton acts of the Defendants; (5) pre-judgment and post-judgment interest; and (6) for her costs and attorneys' fees and such other relief as this Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Mary Ann Heckman demands a trial by jury on all counts and issues so triable.

DATED: October 10, 2006.

s/ Kyle M. Bogdan

| | |
|---|---|
| J. Michael Grier | KS #12047 |
| Kyle M. Bogdan | KS #20182 |

WARDEN TRIPLETT GRIER, P.A.
9401 Indian Creek Parkway, Suite 1100
Overland Park, KS  66210
Phone: (913) 491-3000
Fax: (913) 491-2979
mgrier@wtglaw.com
kbogdan@wtglaw.com
*Attorneys for Plaintiff Mary Ann Heckman*

Plaintiff designates Kansas City, KS as place of trial.