**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **MARY ANN HECKMAN,**           )<br>                                                              )<br>                    **Plaintiff,**           )<br>                                                              )<br>**v.**                                                    )<br>                                                              )<br>**ZURICH HOLDING COMPANY**      )<br>**OF AMERICA, et al.,**                )<br>                                                              )<br>                    **Defendants.**      )<br>_____) | **CIVIL ACTION**<br><br>**No. 06-2435-KHV** |

**MEMORANDUM AND ORDER**

Mary Ann Heckman brings suit against Zurich Holding Company of America ("Zurich") and Universal Underwriters Insurance Company d/b/a Universal Underwriters Group ("UUG") alleging retaliatory discharge and defamation under Kansas law. This matter comes before the Court on Defendant's Motion To Dismiss (Doc. #10) filed November 11, 2006. For reasons stated below, the Court overrules the motion.

**Legal Standards**

Defendants seek dismissal of the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) motion should not be granted unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957); GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997). The Court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences from those facts in favor of plaintiff. See Shaw v. Valdez, 819 F.2d 965, 968 (10th Cir. 1987). In reviewing the sufficiency of plaintiff's complaint, the issue is not whether plaintiff will prevail, but whether she is entitled to offer evidence to support her

claims.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  Although plaintiff need not precisely state each element of her claims, she must plead minimal factual allegations on those material elements that must be proved.  See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

## **Factual Background**

Plaintiff's complaint is summarized as follows:[1]

In August of 1995, Zurich hired plaintiff as a research attorney primarily to perform tax work for UUG.  Plaintiff served under and reported to UUG executives.  At the time Zurich hired plaintiff, UUG was significantly overcharging its customers through incorrect rating plans and Curt Starnes, then UUG's general counsel, and others at UUG began to develop a comprehensive compliance program to cure UUG's rating problems.[2]

Eventually, UUG's Property and Casualty Services Department conducted rating and pricing audits and gave UUG's legal department information obtained in these audits.  In 1998, defendants directed plaintiff to assume partial responsibility for distributing compliance reports to certain UUG officers and employees, including acting Presidents and Chief Executive Officers Ken Goldstein and Steve Smith, Executive Vice President Mike McHugh and the senior risk management officer, senior

---

[1] Plaintiff originally filed a redacted version of the complaint along with a complete copy attached as an exhibit filed under seal.  Defendants attached a copy of the unredacted complaint to their memorandum in support of the motion, which was also filed under seal.  Both parties argue the sufficiency of the unredacted complaint, and the Court will consider the unredacted complaint for purposes of the motion.

[2] Plaintiff alleges that beginning in 1995, defendants' top-level executives and supervisors were aware of such compliance problems.  These individuals included Steve Rand (UUG's former Vice President and General Manager of Eastern District and District Manager for Pennsylvania and current Commercial Markets Executive Vice President), Gabe Shawn Vargas (Chief Compliance Officer of Zurich Financial Services) and Dave Bowers (Executive Vice President and Zurich's highest ranking legal officer).  None of these individuals cooperated with UUG's attempts to remedy its compliance problems.

vice president and vice president/general manger of the audited divisions, including Steve Rand, Dennis Kane and Bob Tshippert. These compliance reports detailed UUG violations identified through the audits and proposed corrective action plans. UUG's Board of Directors, which included Zurich's Chief Executive Officer, Chief Financial Officer and Dave Bowers (Zurich's highest ranking legal officer), received notice of the compliance violations through its annual board meeting.

From 1995 until 2005, defendants' executives, supervisors and business entities charged with correcting compliance violations repeatedly ignored the corrective action plans proposed in the compliance reports.[3] The violations continued despite yearly briefing on such violations and continued attempts by the UUG legal department to implement corrective action plans.

In December of 2004, the Kansas Department of Insurance ("KDI") performed a Market Conduct Exam which revealed UUG's compliance and pricing violations. On June 29, 2005, KDI issued a draft report of the examination to UUG. KDI found a large number of rating errors in UUG's commercial package policies and ordered UUG to refund to customers the overcharges discovered during the examination. KDI estimated that refunds would cover Kansas policies issued after January of 2002, and would range from $1,000 to $10,000 per commercial account. Zurich Financial Services took a $1 million charge to cover its estimate of the refund cost in all states.[4]

On July 7, 2005, UUG placed Starnes (UUG's general counsel) on administrative leave and

---

[3] Plaintiff suggests that the compliance violations were ignored because the proposed corrective action plans would cause defendants to fall short of annual profitability goals, resulting in the loss of substantial distributions of money. Plaintiff alleges that the same individuals who set annual profitability goals were also aware of compliance problems.

[4] Zurich Financial Services (referred to by defendants as "Zurich Switzerland") is distinct from Zurich Holding Company of America ("Zurich" for purposes of the motion). The complaint does not reveal the precise relationship between these two companies, although it appears that Zurich Financial Services may be the parent company of Zurich Holding Company of America.

promoted plaintiff to interim general counsel. Dave Bowers (Zurich's highest ranking legal officer) promised plaintiff that he would recommend she be named UUG's general counsel if Starnes did not return.

After KDI released its report, Zurich hired the law firm of LeBoeuf, Lamb, Greene and MacRae LLP ("LeBoeuf") to provide an opinion as to UUG's self-reporting requirements and conduct an investigation into the compliance violations. UUG did not independently hire another law firm to represent its interests with regard to the compliance violations. Plaintiff willingly participated in efforts to assist LeBoeuf, including coordinating the logistics of the investigation. During the investigation, LeBoeuf attorneys and Zurich internal auditors interviewed plaintiff, focusing on the violations and plaintiff's efforts to rectify them. Plaintiff informed LeBoeuf that Zurich had been aware of UUG's violations for years.

In August of 2005, plaintiff met with LeBoeuf attorneys, Monica Maechler (Zurich Financial Services' general counsel), Urs Schwartz (in-house counsel for Zurich Financial Services), Tom Bradley (UUG's president and chief executive officer), Dave Bowers (Zurich's highest ranking legal officer), Mike McHugh (UUG's executive vice president), Randy Seiner (Zurich's vice president of state government affairs) and others to discuss UUG's violations and self-reporting obligations. During the meeting, LeBoeuf recommended that UUG report that its violations were the result of a computer glitch. Plaintiff immediately expressed to all meeting participants her unwillingness to advance such a lie. After plaintiff refused to advance the computer glitch excuse, LeBoeuf and attorneys for Zurich Financial Services decided that LeBoeuf attorneys would represent UUG before state insurance regulators regarding the violations. In September of 2005, LeBoeuf attorneys falsely represented to the Pennsylvania insurance regulator that UUG made the decision to overcharge customers without the

4

knowledge of Zurich.

During a de-briefing of the meeting between LeBoeuf and the Pennsylvania insurance regulator, plaintiff informed Tom Bradley (UUG's president and chief executive officer) and Dave Bowers (Zurich's highest ranking legal officer) that LeBoeuf had told the state insurance regulator that Zurich had no knowledge of UUG's violations. Plaintiff also informed Bradley and Bowers that LeBoeuf's representation was false and that she would not support the story. Shortly thereafter, defendants prohibited plaintiff from engaging in direct communication with any state insurance regulator without first filtering such communication through LeBoeuf.

After plaintiff reported her concerns regarding LeBoeuf's investigation to Bradley and Bowers, Bowers sent Dick Hennig, in-house counsel for Zurich, to monitor plaintiff with the stated reason that Hennig was to offer any assistance he could regarding UUG's remediation efforts. Plaintiff later learned that LeBoeuf had recommended that a Zurich representative be sent to oversee remediation efforts under the pretext of Zurich's corporate governance obligations. After Hennig arrived at UUG, plaintiff learned that LeBoeuf and Bowers believed that his presence would restrict plaintiff from continuing to question LeBoeuf's investigation.

On October 6, 2005, Bradley (UUG's president and chief executive officer) called a meeting with various UUG employees, including plaintiff. At this meeting, Bradley stated that he and Axel Lehmann (Zurich's chief executive officer) had been fully briefed on the LeBoeuf investigation and would not terminate any employees as a result of the investigation. Later that day, plaintiff met with Bradley and reiterated that UUG and Zurich had repeatedly ignored her efforts to implement corrective

action plans and had discounted her recommendations regarding self-reporting.[5] During this meeting, plaintiff also made clear that LeBoeuf was conducting a sham investigation and that she would not be made a scapegoat for UUG's compliance violations. Bradley assured plaintiff that she would not be made a scapegoat and offered to prepare a positive evaluation of her work performance to entice her to remain as UUG's interim general counsel.

On October 24, 2005, plaintiff initiated a telephone conference with Bradley, Randy Seiner (Zurich's vice president of state government affairs) and Benson Jeffress.[6] During this conference, plaintiff informed Bradley that LeBoeuf's sham investigation was jeopardizing the rights and interests of UUG. Plaintiff also told Bradley that LeBoeuf had lied to state insurance regulators regarding Zurich's knowledge of UUG's violations.

On February 27, 2006, Bradley fired plaintiff, stating that the LeBoeuf investigation report indicated that plaintiff had failed to report the violations and had requested that all UUG compliance audits be suspended.[7] Russ Alford (UUG's vice president of corporate development) was present for the termination. During the termination, Bradley gave plaintiff a letter demanding that she refrain from sharing information learned or gleaned as a result of her position as in-house counsel for UUG with anyone, including her own personal counsel, and prevented her from using her company telephone or accessing her computer. Within 15 minutes of her termination, UUG forced plaintiff to exit its premises

---

[5] Plaintiff requested that Bowers participate in the meeting by telephone, but he did not do so.

[6] The complaint indicates that Jeffress is a UUG employee, but does not reveal his role within the company.

[7] Plaintiff alleges that Bradley knew that these reasons were false. The complaint does not indicate whether the LeBoeuf investigation report actually contained these findings or Bradley manufactured them. Plaintiff alleges that she never saw a copy of the LeBoeuf investigation report.

and leave behind her personal effects and other files, which it later shipped to her house. After plaintiff's termination, UUG sent an email to approximately 1,900 UUG employees informing them that plaintiff had left UUG to pursue other interests. Many of the employees knew that UUG had actually terminated plaintiff's employment, and word soon spread around UUG to almost all of the 1,900 employees that UUG had fired plaintiff.

Plaintiff claims that in violation of Kansas common law, (1) defendants terminated her employment in retaliation for blowing the whistle on defendants' illegal activity[8] and (2) top-level executives of Zurich and UUG, along with LeBoeuf attorneys working on behalf of Zurich, defamed her to top-level executives at Zurich Financial Services, Zurich and UUG, to employees of Zurich and UUG, and to third parties, including insurance regulators and others in the insurance industry.

## Analysis

**I.     Plaintiff's Retaliatory Discharge Claim**

Plaintiff claims that defendants terminated her employment in retaliation for blowing the whistle on defendants' illegal activity. Kansas subscribes to the doctrine of employment at will. Absent an express or implied contract of fixed duration, or where recognized public policy concerns are raised, employment is terminable at the will of either party. Frye v. IBP, Inc., 15 F. Supp.2d 1032, 1046 (D. Kan. 1998). One exception to this general rule is termination for whistleblowing. See Palmer v. Brown, 242 Kan. 893, 900, 752 P.2d 685, 689-90 (1988). Under Kansas law, plaintiff establishes a prima facie case of retaliation for whistleblowing by showing that (1) a reasonably prudent person would

---

[8]     The complaint does not identify any specific laws which Zurich and UUG allegedly violated. Plaintiff alleges, however, that Zurich and UUG were engaged in activities in violation of rules, regulations or the law pertaining to public health, safety and general welfare. These illegal activities allegedly included lying to and misleading various state insurance regulators by representing that Zurich had no knowledge of UUG's violations, which had been occurring since 1995.

7

have concluded that plaintiff's co-worker or employer was violating rules, regulations or the law pertaining to public health, safety and general welfare; (2) the whistleblowing was done in good faith based on a concern regarding that wrongful activity, rather than a corrupt motive like malice, spite, jealousy or personal gain; (3) the employer knew of the employee's report before it discharged the employee; and (4) defendant discharged the employee in retaliation for making the report.  See Goodman v. Wesley Med. Ctr., L.L.C., 276 Kan. 586, 589-90, 78 P.3d 817, 821 (2003) (citing Palmer, 242 Kan. at 900, 752 P.2d at 689-90).

Defendants argue that the Court should dismiss plaintiff's retaliatory discharge claim under Rule 12(b)(6) because she has not cited, referred to or otherwise identified a rule, regulation or law pertaining to public health, safety or general welfare which defendants allegedly violated.  Plaintiff responds that (1) pleading rules do not require her to identify the specific rule, regulation or law which defendants violated, and (2) the complaint demonstrates that she blew the whistle on violations of the Kansas Insurance Code, K.S.A. § 40-101 et seq., which protects the general public.

Under Rule 8(a), Fed. R. Civ. P., the complaint must set forth "a short a plaint statement of the claim showing that the pleader is entitled to relief."  This rule is intended to provide defendants with fair notice of the claims against them.  See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002).  Rule 8(a) is the starting point of the simplified pleading system in federal court.  Id. at 513-14.

Defendants' argument that plaintiff must identify a specific law relies primarily on Diebold v. Sprint/United Management Co., No. 01-2504-KHV, 2002 WL 1071923 (D. Kan. Apr. 29, 2002), where the Court noted that "the lenient standard of notice pleading does not eliminate plaintiff's burden to identify what she believed [defendant] had done to violate specific policies, regulations or laws."  Id. at *4.  This reliance is misplaced, however, because in Diebold, the complaint identified specific laws

and regulations which defendant allegedly violated, e.g. OSHA regulations. Id. at *3. Diebold's concern centered on the absence of allegations regarding defendant's conduct. See id. (noting that plaintiff identified laws, but did not allege that defendant violated those laws). Here, plaintiff clearly has alleged objectionable conduct (e.g. lying to and misleading various state insurance regulators) which forms the basis of her whistleblower claim, and the complaint is therefore sufficient under Diebold.

The Court agrees with plaintiff that at this stage of the litigation she is not required to identify a specific rule, regulation or law which defendants allegedly violated. Because the Court cannot conclude as a matter of law that defendants' alleged conduct does not violate rules, regulations or laws pertaining to public health, safety and general welfare, plaintiff is entitled to present evidence in support of her whistleblower claim, and the specifics of such claim should be fleshed out through discovery. See Wood v. Handy & Harman Co., No. 05-CV-532-TCK-FHM, 2006 WL 3228710, at *8-9 (N.D. Okla. Nov. 6, 2006) (noting denial of motion to dismiss whistleblower claim for failure to allege specific statute; discussing development of claim through discovery); Keefer v. Durkos, 371 F. Supp.2d 686, 692 (W.D. Pa. 2005) (no reason why plaintiff must enumerate specific laws in whistleblower complaint under notice pleading system; parties should develop allegations in discovery). Accordingly, the Court overrules defendants' motion to dismiss plaintiff's whistleblower claim.[9]

**II.   Plaintiff's Defamation Claim**

Plaintiff claims that top-level executives of Zurich and UUG, along with LeBoeuf attorneys working on behalf of Zurich, defamed her to top-level executives at Zurich Financial Services, Zurich and UUG, to employees of Zurich and UUG, and to third parties, including insurance regulators and

---

[9] Because it is not necessary to its ruling on the motion, the Court will not consider the parties' arguments whether the Kansas Insurance Code may support plaintiff's whistleblower claim.

9

others in the insurance industry. To establish her defamation claim under Kansas law, plaintiff must show (1) false and defamatory words; (2) communicated to a third person; (3) which resulted in harm to her reputation. See Hall v. Kan. Farm Bureau, 274 Kan. 263, 276, 50 P.3d 495, 504 (2002). Defendants argue that plaintiff has failed to state a defamation claim under Kansas law because (1) the complaint does not sufficiently identify the communicators and the substance of their statements, (2) the challenged statements are not defamatory as a matter of law and (3) plaintiff has not alleged special damages.

### A.     Sufficiency Of Pleading

Defendants argue that the Court should dismiss plaintiff's defamation claim under Rule 12(b)(6) because the complaint does not sufficiently identify the communicators and the substance of the allegedly defamatory statements. Plaintiff responds that (1) her defamation claim is not subject to a heightened pleading requirement under the Federal Rules of Civil Procedure and (2) the complaint provides a "fairly specific list" of communicators and their statements, including the statements that plaintiff failed to report compliance UUG's violations and had requested all compliance audits be suspended.

The requisite specificity of plaintiff's defamation claim is governed by Rule 8(a), described above. In the context of a defamation claim, Rule 8(a) requires that the complaint provide sufficient notice of the communications complained of to allow defendants to defend themselves. McGeorge v. Cont'l Airlines, Inc., 871 F.2d 952, 955 (10th Cir. 1989). In practice, defamation claims present a "significant exception" to general liberal pleading standards because defamation constitutes a "traditionally disfavored" cause of action. Bushnell Corp. v. ITT Corp., 973 F. Supp. 1276, 1287 (D. Kan. 1997). To sufficiently plead her defamation claim, plaintiff must set forth in her complaint the

allegedly defamatory words, the communicator of those words, the persons to whom those words were published and the time and place of publication. See id.; Marten v. Yellow Freight Sys., Inc., 993 F. Supp. 822, 829 (D. Kan. 1998); see also Jackson v. Kan. County Ass'n Multiline Pool, No. 03-4181, 2006 WL 963838, at *21 (D. Kan. Apr. 10, 2006).

Plaintiff's general defamation allegations state that

> Top-level/supervisory executives at Zurich NA and UUG as well as attorneys for LeBoeuf working on behalf of Zurich NA communicated false and defamatory words regarding Plaintiff to other top-level/supervisory executives at Zurich Switzerland, Zurich NA, UUG, to over 1900 Zurich NA and UUG employees, as well as to other third-parties. The third-parties include various insurance regulators for various states and others in the insurance industry.

Unredacted Draft Of Complaint, attached as Exhibit 1 to Complaint (Doc. #1) filed October 10, 2006, ¶¶ 88-89. These allegations are insufficient to give defendant notice of the substance of plaintiff's defamation claim under Rule 8(a). Specifically, the generic statements that "top-level/supervisory executives" and LeBoeuf attorneys communicated with "other top-level/supervisory executives" and "various insurance regulators for various states and others in the insurance industry" do not provide adequate details of the defamation claim to enable defendants to defend the allegation. See Bushnell, 973 F. Supp. at 1287 (allegation that company, distributors and employees made statements to customers and industry in general not sufficient to state defamation claim). Also, these allegations do not set forth the substance of the alleged false and defamatory words or the time and place of publication.

Beyond these generic allegations, however, the complaint contains more specific allegations of defamation. Specifically with regard to her termination, plaintiff alleges that

> On February 27, 2006, President and CEO Bradley fired Plaintiff. Russ Alford, Vice President of Corporate Development for UUG was present during the firing. President and CEO Bradley stated the reasons he was firing her were that the LeBoeuf Report opined Plaintiff failed to report UUG's compliance violations and that Plaintiff had requested all UUG compliance audits be suspended. President and CEO Bradley knew

11

>these reasons were false but nonetheless fired Plaintiff despite the fact he told her that he and Zurich NA's Top Legal Officer Bowers would provide plaintiff a positive review to appease her concerns that she would [not] be made a scapegoat by LeBoeuf and the Companies.

Unredacted Draft Of Complaint ¶¶ 68-70. These allegations sufficiently identify the defamatory words (statements that plaintiff failed to report compliance violations and requested suspension of audits), the communicator of those words (Bradley), the person to whom those words were published (Alford)[10] and the time and place of publication (plaintiff's termination meeting on February 27, 2006). Because these allegations are sufficient to state a defamation claim under Kansas law, the Court overrules the motion to dismiss on the ground that the complaint does not comply with Rule 8(a).

To the extent that plaintiff claims additional instances of defamation, her allegations are insufficient.[11] Should plaintiff wish to assert additional grounds for her defamation claim, the Court will

---

[10] Citing paragraphs 57 and 58 of the complaint, plaintiff argues that the defamatory statements contained in the LeBoeuf investigation report were also communicated between Zurich and UUG. In this regard, the complaint states as follows:

>On or about October 6, 2005, President and CEO Bradley called a meeting with various UUG employees, including Plaintiff. At this meeting President and CEO Bradley stated he and Axel Lehmann, Zurich NA's CEO, had been fully briefed on the LeBoeuf investigation and that the Companies would not terminate anybody as a result of the investigation. Plaintiff was never shown a copy of any written report relating to the investigation although LeBoeuf drafted a report containing the finding of their investigation.

Unredacted Draft Of Complaint ¶¶ 57-58. These allegations state only that Bradley and Lehman had been "briefed" on the LeBoeuf investigation report, but do not state that the LeBoeuf report actually contained the alleged defamatory statements of which plaintiff complains or that such statements were specifically communicated to Bradley and Lehman. These allegations are insufficient to bolster the publication element of plaintiff's defamation claim.

[11] For example, although plaintiff does not cite this allegation in her response to the motion, paragraph 77 of the complaint states that "[a]fter Plaintiff was fired, UUG sent an email to some 1,900 employees informing them Plaintiff had left UUG to pursue other interests." The

(continued...)

entertain a timely filed motion to amend the complaint.

### B. Defamatory Statements

Defendants argue that the Court should dismiss plaintiff's defamation claim under Rule 12(b)(6) because the statement that plaintiff left UUG to pursue other interests does not diminish plaintiff's esteem or goodwill or excite unpleasant feelings toward her and is therefore not defamatory as a matter of law. Plaintiff does not respond to this argument, but argues that the statements that she failed to report UUG compliance violations and requested that all compliance audits be suspended are defamatory. Defendants argue that by her failure to respond, plaintiff has abandoned any defamation claim based on the statement that she left UUG to pursue other interests. Because plaintiff has failed to state a defamation claim based on such statement, see supra note 11, the Court need not determine whether plaintiff has abandoned any such claim. The Court will consider the alleged statements that plaintiff did not report UUG compliance violations and requested that all compliance audits be suspended.

Under Kansas law, defamatory words are those which tend to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinion against her. Woodmont Corp. v. Rockwood Ctr. P'ship, 811 F. Supp. 1478, 1481 (D. Kan. 1993) (citing Gomez v. Hug, 7 Kan. App.2d 603, 611, 645 P.2d 916, 923 (1982)). Statements which are defamatory by implication must use language which is reasonably capable of defamatory interpretation. Id. Here, the statements about plaintiff's conduct regarding UUG's violations may be susceptible to defamatory meaning in that they suggest incompetence or malfeasance by plaintiff.

---

[11](...continued)
allegation that "UUG sent an email" is insufficient to identify the communicator of the alleged defamatory words such that defendants may defend the claim.

See id. (reasonable conclusion of incompetence or implication of wrongdoing sufficient to construe statement as defamatory). The Court cannot conclude that plaintiff can prove no set of facts from which a jury might find the challenged statements defamatory. Accordingly, the Court overrules the motion to dismiss on the ground that the alleged statements are not defamatory as a matter of law.

### C. Special Damages

Defendants argue that the Court should dismiss plaintiff's defamation claim under Rule 12(b)(6) because the complaint does not allege special damages. Plaintiff responds that defendants' statements constitute defamation *per se*, which eliminates the need to plead special damages.

Rule 9(g) provides that "[w]hen items of special damages are claimed, they shall be specifically stated." Under Kansas law, damages recoverable for defamation may not be presumed, Gobin v. Globe Publ'g Co., 232 Kan. 1, 5, 649 P.2d 1239, 1242 (1982), and plaintiff must show special damages unless she claims defamation *per se*, Gomez, 7 Kan. App.2d at 612, 645 P.2d at 923. Statements which are defamatory *per se* include statements which impute plaintiff's unfitness for her trade or profession. See id. Actionable statements which impute unfitness for trade or profession must be of such a character as to disparage plaintiff's pursuit of her business, and statements imputing a single mistake must fairly imply a habitual course of conduct. Woodmont Corp., 811 F. Supp. at 1484.

Here, the Court cannot conclude as a matter of law that the statements that plaintiff failed to report UUG compliance violations and requested that all compliance audits be suspended are not defamatory *per se*. As noted above, the alleged statements may be interpreted to suggest incompetence or wrongdoing, which would undermine plaintiff's legal capability and performance within her profession. The fact that the statements may raise the inference of a pattern of incompetence is sufficient to relieve plaintiff of the obligation to plead special damages for purposes of the motion to

14

dismiss. See id. Accordingly, the Court overrules the motion to dismiss on the ground that the complaint fails to plead special damages.

**IT IS THEREFORE ORDERED** that Defendant's Motion To Dismiss (Doc. #10) filed November 11, 2006 be and hereby is **OVERRULED**.

Dated this 28th day of February, 2007 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge
